```
                                              FILED
                                    CLERK, U.S. DISTRICT COURT

                                         SEP 2 1 2018

                                    CENTRAL DISTRICT OF CALIFORNIA
                                    BY                      DEPUTY
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2018 Grand Jury

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

SCOTT SEO,
  aka "Seung Hye Seo,"
  aka "Scott Hoon Seo," and
WILBUR M. SALAO,
  aka "Will Salao,"

        Defendants.

No. CR18-00625-JAK

I N D I C T M E N T

[18 U.S.C. § 371: Conspiracy;
18 U.S.C. § 1346: Honest Services
Fraud; 18 U.S.C. § 1341: Mail
Fraud; 18 U.S.C. § 1343: Wire
Fraud; 18 U.S.C. § 666(a)(2):
Bribery Concerning Programs
Receiving Federal Funds; 18 U.S.C.
§ 2: Aiding and Abetting and
Causing an Act to be Done]

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

A.   RELEVANT PERSONS AND ENTITIES

    1.   The State of California ("California" or "State") and the California Department of Alcoholic Beverage Control ("ABC") received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance during the following one-year periods:

| Begin Date | End Date |
|---|---|
| October 1, 2013 | September 30, 2014 |
| October 1, 2014 | September 30, 2015 |
| October 1, 2015 | September 30, 2016 |

2.   The ABC was vested with the exclusive power to license and regulate persons and businesses engaged in the manufacture, importation, distribution, and sale of alcoholic beverages in the State of California.  The ABC's mission was to administer the provisions of the Alcoholic Beverage Control Act in a manner that fostered and protected the health, safety, welfare, and economic well-being of California citizens.  The ABC's responsibilities included, among others: (1) licensing, to ensure that only qualified persons and legitimate businesses were licensed to sell, manufacture, and otherwise deal in alcoholic beverages; and (2) enforcement, to ensure adherence to the alcoholic beverage control laws and regulations.  Penalties paid in lieu of license suspensions were collected into the Alcohol Beverage Control Fund, and were then transferred to the State General Fund.

3.   Defendant WILBUR M. SALAO, also known as ("aka") "Will Salao" ("defendant SALAO"), was a public official employed by the ABC, and an agent of the ABC and the State.  Defendant SALAO began working at the ABC in or around July 1997.  Beginning in at least about 2010, defendant SALAO was a District Administrator in the Los Angeles Metro ABC office, within the Central District of California.

4.   As an ABC district administrator, defendant SALAO's duties and responsibilities included, among others: (1) directing the work of the field office in licensing activities; (2) reviewing and

2

1  evaluating final recommendations for the issuance or denial of

2  licenses; (3) directing the enforcement staff and enforcement

3  operations; (4) coordinating and conducting disciplinary hearings

4  with licensees; and (5) proposing dispositions of disciplinary cases.

5      5.   As an ABC employee, under Section 830.2(h) of the

6  California Penal Code, defendant SALAO was a peace officer whose

7  authority extended to any place in the State to investigate and make

8  arrests for violations of the California Business and Professions

9  Code.   Under Section 25755 of the California Business and Professions

10 Code, defendant SALAO was further empowered to enforce California

11 penal provisions anywhere in the State.

12     6.   As a public official employed by the State, defendant SALAO

13 owed a fiduciary duty to the citizens of the State and to defendant

14 SALAO's employer, the ABC, to perform the duties and responsibilities

15 of defendant SALAO's office free from bias, conflicts of interest,

16 self-enrichment, self-dealing, concealment, deceit, fraud, kickbacks,

17 and bribery.

18     7.   Defendant SCOTT SEO, aka "Seung Hye Seo," aka "Scott Hoon

19 Seo" ("defendant SEO"), was a consultant who offered consulting

20 services on, among other things, matters concerning ABC licenses, ABC

21 condition modifications, and ABC enforcement and disciplinary

22 resolutions.   Defendant SEO began his consulting business in

23 approximately 2006, after serving as an investigator for the ABC for

24 approximately 15 years.   As a consultant, defendant SEO marketed his

25 services to, among others, businesses in the Koreatown area of Los

26 Angeles, California.   Defendant SEO marketed his services by mailing

27 marketing materials and on the websites www.abcllc-ca.com and

28 www.liquorlicenseexpediters.com.

8.    Alcoholic Beverage Control LLC ("ABC LLC") was a consulting company registered in the State of California, with an office located at 3460 Wilshire Boulevard, Suite 1240, Los Angeles, California 90010.   Defendant SEO was the organizer, manager, and agent for service of process for ABC LLC.

9.    Defendant SEO opened a Bank of America business account for ABC LLC, ending in 0781 (the "ABC LLC Account"), which defendant SEO used to deposit checks from clients, to write checks to defendant SALAO and others, and to pay various expenses.

10.    "Asian Persuasion Control," "Asian Persuasion Coalition," "APC" and "AP" were informal names defendant SEO and defendant SALAO used to refer to themselves and their schemes to use defendant SALAO's official position at ABC to benefit defendant SEO in exchange for money.

B.   BACKGROUND ON ABC LICENSING AND ENFORCEMENT

11.    Any establishment in California serving alcohol was required to have a license from the ABC.   Before issuing a license, the ABC evaluated the proposed establishment and the applicant's moral character and fitness to sell alcohol.   The applicant was required to post public notices regarding the liquor license at the establishment and in the local media.   Citizens could protest the granting of a license.   Government entities, such as a city council or local police department could also notify the ABC of reasons for contesting the license, such as evidence that the issuance of a license would cause a public nuisance.   All ABC licenses were subject to specific operating conditions, including, for example, specific hours of operation, total capacity, security guard requirements, bottle service restrictions, and live entertainment restrictions.

4

12.  When applying for an ABC license, the applicant was required to file various documents, including a petition listing the specific operating conditions and an ABC-257 Form.  The front of the 257 Form included a diagram of the licensed premises, the only area within which the establishment can legally serve alcoholic beverages.  The back of the 257 Form included the specific operating conditions for the establishment.  Once approved, changing operating conditions (referred to as a "condition modification") or the licensed premises diagram required formal applications and approvals.  The ABC maintained these documents at its district offices.  ABC staff, including district administrators, had access to these documents within ABC's district files.

13.  License holders were subject to routine and random inspections by the ABC to ensure compliance with license operating conditions and the law, such as the prohibition against selling alcohol to minors.  The ABC's planned enforcement operations (or "raids") were kept confidential to ensure their effectiveness and for enforcement staff safety.

14.  If ABC staff observed a violation at a licensed premises, a district administrator sent a letter (referred to as a "309 letter") to request the licensee's attendance at a "309 hearing" or "309 meeting" at the ABC office to discuss the alleged violation and potential resolution.  The licensee could attend the hearing on his/her own or with a consultant or attorney.  After the 309 hearing, the district administrator prepared a report with a recommendation on filing an accusation and proposed discipline.  The potential disciplinary actions included, among others, a Letter of Warning ("LOW"), a fine (referred to as a Petition Offer in Compromise or

"POIC"), suspension of the license for a specific number of days, and revocation of the license.  The licensee could either sign a stipulation and waiver pleading guilty to the violation and waiving an administrative hearing, or litigate the accusation in an administrative hearing before an administrative law judge.

C.   KOREATOWN ESTABLISHMENTS

15.   Koreatown was a neighborhood in central Los Angeles, California, located within City Council District 10.  The Los Angeles Police Department ("LAPD") provided police service to the City of Los Angeles, with the LAPD Olympic Division serving the Koreatown area.

16.   Establishments in Koreatown served and sold alcoholic beverages in room salons, karaoke bars, restaurants, and nightclubs. These establishments were licensed by the ABC and subject to ABC regulations and enforcement.  Common violations encountered by the ABC and LAPD in Koreatown establishments included: (1) operating past the closing hour specified in the operating conditions (referred to as "afterhours" violations); (2) paying females to encourage drinking by patrons, to act as escorts, or to engage in other illegal conduct (commonly referred to as "b-girls," "dowoomi," and "doumi"); and (3) serving alcohol to minors.

17.   Businesses 1-8 were establishments in Koreatown subject to ABC regulations and enforcement.

18.   These Introductory Allegations are hereby incorporated by reference into each count of this Indictment as if set forth fully therein.

COUNT ONE

[18 U.S.C. § 371]

A.   OBJECTS OF THE CONSPIRACY

19.   Beginning on an unknown date but no later than December 9, 2011, and continuing until on or about May 3, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant SEO and defendant SALAO, together with others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed with each other to knowingly and intentionally commit offenses against the United States, namely: (1) Bribery Concerning Programs Receiving Federal Funds, in violation of Title 18, United States Code, Section 666; (2) Honest Services Fraud, in violation of Title 18, United States Code, Sections 1341, 1343, and 1346; and (3) Extortion under Color of Official Right, in violation of Title 18, United States Code, Section 1951.

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

20.   The objects of the conspiracy were to be accomplished, in substance, as follows:

a.   Defendant SEO would provide defendant SALAO bribes and kickbacks in the form of monetary payments in exchange for official acts from defendant SALAO.

b.   Defendant SEO would target businesses for enforcement actions, allowing defendant SEO to sign new clients, to generate fees from existing clients, to harm competitors and rivals, and to force businesses to sell their establishments to defendant SEO and his associates.

c.   In exchange for receiving bribes and kickbacks from defendant SEO, defendant SALAO would perform at least the following official acts in his capacity as an ABC District Administrator:

i.   directing ABC enforcement operations and disciplinary actions against targeted businesses defendant SEO selected;

ii.  altering official ABC documents at the direction of defendant SEO, including modifying diagrams and operating conditions;

iii. sharing non-public information with defendant SEO to benefit defendant SEO and his clients;

iv.  expediting the licensing process for defendant SEO's clients at defendant SEO's direction; and

v.   delaying the licensing process for defendant SEO's competitors at defendant SEO's direction.

d.   Defendant SEO and defendant SALAO would conceal from the ABC and the State that defendant SEO paid defendant SALAO bribes and kickbacks in exchange for official acts from defendant SALAO.

e.   Defendant SEO would convince business owners to pay defendant SEO a "consulting fee" to avoid harsh disciplinary actions imposed by defendant SALAO as an ABC District Administrator.

C.   OVERT ACTS

21.  In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, on or about the following dates, defendant SEO and defendant SALAO, and others known and unknown to the Grand Jury, committed various overt acts in Los Angeles County, within the Central District of California, and elsewhere, including, but not limited to, the following:

1          a.   Bribe and Kickback Payments

2          Overt Act No. 1: On January 22, 2014, during an in-person

3    meeting in Los Angeles County, defendant SEO paid defendant SALAO a

4    $1,900 cash bribe.

5          Overt Act No. 2: On April 24, 2014, during an in-person meeting

6    in Los Angeles County, defendant SEO paid defendant SALAO a $2,000

7    bribe by check, check number 1021, from the ABC LLC Account.

8          Overt Act No. 3: On February 6, 2015, during an in-person

9    meeting in Los Angeles County, defendant SEO paid defendant SALAO a

10   $2,500 bribe by check, check number 1037, from the ABC LLC Account.

11         Overt Act No. 4: On March 4, 2015, during an in-person meeting

12   in Los Angeles County, defendant SEO paid defendant SALAO a $2,500

13   bribe by check, check number 1042, from the ABC LLC Account.

14         Overt Act No. 5: On April 30, 2015, during an in-person meeting

15   in Los Angeles County, defendant SEO paid defendant SALAO a $2,250

16   bribe by check, check number 1053, from the ABC LLC Account.

17         Overt Act No. 6: On June 16, 2015, during an in-person meeting

18   in Los Angeles County, defendant SEO paid defendant SALAO a $2,500

19   bribe by check, check number 1065, from the ABC LLC Account.

20         Overt Act No. 7: On August 17, 2015, during an in-person

21   meeting in Los Angeles County, defendant SEO paid defendant SALAO a

22   $2,500 cash bribe.

23         Overt Act No. 8: On October 14, 2015, during an in-person

24   meeting in Los Angeles County, defendant SEO paid defendant SALAO a

25   $5,250 bribe by check.

26         Overt Act No. 9: On January 28, 2016, during an in-person

27   meeting in Los Angeles County, defendant SEO paid defendant SALAO a

28   $2,000 cash bribe.

1          b.    $60,000 Cash Payment to "Fix" ABC License Issue

2      Overt Act No. 10:  On December 9, 2011, defendant SALAO caused

3  the ABC to raid Business 1.

4      Overt Act No. 11:  On December 12, 2011, defendant SALAO sent an

5  e-mail from his ABC e-mail account informing Business 1 that the ABC

6  will be surrendering Business 1's license, adding: "This process

7  effectively places the license in an inactive status.  The surrender

8  is effective today.  Sales, service or consumption of alcoholic

9  beverages at a business where the license has been surrendered is a

10  misdemeanor."

11      Overt Act No. 12:  Between December 12, 2011 and December 14,

12  2011, defendant SEO met with Cooperating Witness 1 ("CW-1") and

13  Cooperating Witness 2 ("CW-2") at Business 1.  During this meeting,

14  defendant SEO offered to resolve the ABC license issue for $60,000.

15  Defendant SEO told CW-1 and CW-2 that he would need to pay important

16  people at ABC to get their assistance.

17      Overt Act No. 13:  Between December 12, 2011 and December 14,

18  2011, defendant SEO accepted $60,000 in cash from CW-2 as a payment

19  to bribe public officials to resolve Business 1's ABC license issue.

20      Overt Act No. 14:  On December 15, 2011, at defendant SEO's

21  request, defendant SALAO signed and issued a temporary permit to

22  Business 1, allowing Business 1 "to engage in the purchase and sale

23  of alcoholic beverages" from December 15, 2011 to April 14, 2012.

24      Overt Act No. 15:  In December 2011, defendant SEO paid

25  defendant SALAO in cash or by check in return for defendant SALAO's

26  assistance at the ABC.

27

28

c.   Directing Enforcement Operations and Disciplinary
Actions

Overt Act No. 16:   On January 9, 2015, defendant SEO and defendant SALAO had a text message conversation regarding their scheme.   During this conversation, defendant SEO wrote to defendant SALAO: "Remember AP accusation cases you have to find a way to go LOW or reduce penalty.   They have to see value to retain me.   Or else they have to pay POIC and our fees which will be difficult to justify."   Defendant SALAO responded: "Oh of course.   That's why we have operation knock & notice."

Overt Act No. 17:   Later that same day, on January 9, 2015, defendant SALAO wrote: "So my plan for the b-girl places is this: I go in with a partner in uniform.   We inspect the place.   We FI a few girls, take photos, go over what conditions they are violating & leave.   I get back to the office and send a 309 letter a week or two later.   If they are represented by AP, I will conditions, asking for stiff penalty.   We do the same song & dance and they get LOW due to your expertise as former abc.   If they aren't represented by AP and another consultant or attorney calls me, I yell at them for violating their conditions and tell them to knock it off.   Then we make a real case against them."   Defendant SEO responded: "Good plan. I like it."

i.   *Business 2*

Overt Act No. 18:   On December 18, 2014, defendant SEO sent an e-mail to defendant SALAO with an attachment titled "Koreatown Karaoke List."   The attachment listed various establishments to target in an upcoming ABC enforcement operation, including Business 2, listing potential violations at each establishment, such as "afterhours," "Dowoomi," "B-girls," and noting that seven of the

targets "will most likely NOT retain me so make sure you put some fear into them!!  This will be a great start to Operation K-Town."

Overt Act No. 19:  On February 5, 2015, defendant SEO and defendant SALAO had a text message conversation regarding a "package deal" for the owner of Business 2, including securing only a Letter of Warning for a violation at Business 2.  After defendant SALAO confirmed this resolution was possible, defendant SALAO asked: "How much did you suck out of them?"  Defendant SEO responded: "$7.5 [thousand]."

Overt Act No. 20:  On April 7, 2015, defendant SALAO, in his official ABC capacity and on ABC letterhead, sent a Letter of Warning by U.S. Mail to Business 2.

### ii. Business 3

Overt Act No. 21:  On July 27, 2015, defendant SEO and defendant SALAO had a text message conversation regarding Business 3.  During this conversation, defendant SALAO told defendant SEO: "Also appears that [Business 3] either paid off or tried to pay off recent rape victim at their joint."  When defendant SEO asked what happened, defendant SALAO responded: "Bgirl got raped.  She reported it to LAPD."  Defendant SALAO asked if Business 3 was an APC client.  Defendant SEO responded: "They're not APC.  They haven't responded to my letter.  I'm going to send one more."

Overt Act No. 22:  On August 24, 2015, defendant SEO sent an envelope by U.S. Mail with marketing material in Korean to Business 3.

Overt Act No. 23:  On December 2, 2015, defendant SEO and defendant SALAO, in a text message conversation, discussed that the

"best APC" result for Business 3 for their pending ABC violations was a 60-day suspension.

Overt Act No. 24: On December 14, 2015, defendant SEO and defendant SALAO, in a text message conversation, discussed Business 3's pending ABC violations. During that conversation, defendant SALAO told defendant SEO: "Just [got] dvd of footage. Not good for ABC/LAPD but good for APC. No after hours footage." Defendant SALAO then told defendant SEO that the ABC would seek a 30-day suspension.

Overt Act No. 25: On February 8, 2016, defendant SALAO, in his official ABC capacity and using ABC letterhead, sent a letter by U.S. Mail to Business 3 requesting a 309 meeting.

Overt Act No. 26: On February 12, 2016, defendant SEO, in a text message conversation, told defendant SALAO that Business 3 was "ready to sign stip n waive" for a 30-day suspension.

### iii. Business 4

Overt Act No. 27: On October 22, 2015, defendant SEO sent an e-mail to defendant SALAO identifying target businesses to hit in an upcoming ABC raid, including Business 4.

Overt Act No. 28: On October 24, 2015, defendant SALAO caused the ABC to raid Business 4.

Overt Act No. 29: On November 3, 2015, defendant SALAO, in his official ABC capacity and using ABC letterhead, sent a letter by U.S. Mail to Business 4 requesting a 309 meeting.

Overt Act No. 30: On December 21, 2015, defendant SALAO, in a text message conversation, asked defendant SEO: "Wouldn't it be nice if we could strong arm [Business 4] into selling Biz to APC?"

Overt Act No. 31: On January 13, 2016, defendant SEO met with the owners of Business 4 in Los Angeles, California.

Overt Act No. 32: On January 21, 2016, defendant SEO and defendant SALAO, in a text message conversation, discussed Business 4 as a potential location for defendant SEO and defendant SALAO's Koreatown establishment. During that conversation, defendant SEO told defendant SALAO: "[Business 4] will be APC location #1. Just have to scare [Victim] to convince his mom go sell or lease it out." After defendant SALAO asked "What do you mean?", defendant SEO explained: "I have a team ready to sub-lease or do per to per if [Victim] is scared enough to get out." Defendant SEO later wrote: "We just need enough fear for [Victim] to convince his mom to get out. It's his reputation on the line."

Overt Act No. 33: On February 8, 2016, defendant SALAO, in his official ABC capacity and using ABC letterhead, sent a letter by U.S. Mail to Business 4 requesting a 309 meeting.

Overt Act No. 34: On March 3, 2016, defendant SEO and defendant SALAO, in a text message conversation, discussed "hitting [Business 4] to convince them to get out of Dodge."

Overt Act No. 35: On March 9, 2016, defendant SEO and defendant SALAO, in a text message conversation, discussed their strategy of ABC raids at Business 4. During that conversation, defendant SEO wrote: "Only reason why I'm not down with hitting them now is because we may have to buy existing girls debts if we takeover. And if they get spooked then they will run. And others in Ktown won't want to come work at [Business 4] since they will think it's too risky to work there."

Overt Act No. 36: On March 25, 2016, at defendant SEO's request, defendant SALAO caused the ABC to raid Business 4.

Overt Act No. 37: On May 18, 2016, defendant SEO, in a text message conversation, told defendant SALAO that he (defendant SEO) became a silent part-owner of Business 4.

### d. Altering Official ABC Documents

Overt Act No. 38: On March 14, 2014, defendant SEO and defendant SALAO, in a text message conversation, discussed modifying a diagram in exchange for a $1,000 payment from defendant SEO's client. During that conversation, defendant SEO told defendant SALAO: "need to modify diagram. Storage area built illegally and need to be part of diagram." After confirming that defendant SEO had not filed anything yet, defendant SALAO wrote: "Gimme a drawing and I'll add it to the existing 257."

Overt Act No. 39: On October 9, 2014, defendant SEO and defendant SALAO, in a text message conversation, discussed using their condition modification scheme for one of defendant SEO's clients who wanted to remove three conditions from its operating conditions. During that discussion, defendant SALAO warned: "Can't do all 3. Talk to them and find out which one is most important to them. An old man forgetting to type one condition is not as suspicious as the 3 they wanted removed suddenly disappearing."

Overt Act No. 40: On December 17, 2015, defendant SEO and defendant SALAO, in a text message conversation, discussed their condition modification scheme. During that conversation, defendant SALAO told defendant SEO: "That's way too many for the conditions. We originally discussed the bar issue only. I can't delete almost half of them. Pick one or two that he wants. Whole premise behind APC condition mod is that the LR fucked up and forgot one or two. To delete that many isn't a mistake." In response, defendant SEO

suggested deleting conditions related to the bar, security guard, and bottles.  Defendant SALAO responded: "Yeah that's doable."

      e.    Sharing Non-Public Information

Overt Act No. 41:  On March 7, 2015, defendant SALAO, in a text message conversation, warned defendant SEO of police enforcement action in Koreatown: "Remember Olympic [LAPD] is out tonight."

Overt Act No. 42:  On April 12, 2016, defendant SALAO, in a text message conversation, warned defendant SEO about the identity of a potential informant working with law enforcement in Koreatown: "One of my goons [ABC enforcement officers] said he may be able to turn a bgirl he contacted into a confidential informant.  I'm gonna get her photo and ID to you.  Either way, I'm gonna get you her 411 so if she comes knocking for a job you know what to do."

Overt Act No. 43:  On April 11, 2016, defendant SEO and defendant SALAO, in a text message conversation, discussed confidential identifying information regarding undercover LAPD officers conducting enforcement operations in Koreatown.  During that conversation, defendant SALAO told defendant SEO: "When we do next ktown thing with LAPD I will get you photos of Korean officers." Defendant SEO responded: "NICE!!!!!!!!!!!!! Good thinking." Defendant SALAO then sent a photograph of an officer, writing: "Here's one of them."  Defendant SEO responded: "Nice. I will make sure he's marked."

Overt Act No. 44:  On December 11, 2013, defendant SEO, in a text message conversation, told one of his clients in Koreatown that the LAPD met with the ABC and made plans to raid a particular karaoke establishment in Koreatown.

**Overt Act No. 45:**  On February 6, 2014, defendant SEO, in a text message conversation, warned one of his clients in Koreatown that the LAPD planned a raid in Koreatown that evening.

**Overt Act No. 46:**  On March 7, 2014, defendant SEO, in a text message conversation, warned one of his clients in Koreatown that the LAPD and ABC were "out in Ktown."

**Overt Act No. 47:**  On February 25, 2015, defendant SEO, in a telephone conversation, warned one of his clients in Koreatown of an upcoming raid in Koreatown and advised the client to close the establishment on the night of the planned operation.

                    f.   Expediting or Delaying the Licensing Process

**Overt Act No. 48:**  On August 20, 2015, defendant SEO and defendant SALAO, in a text message conversation, discussed expediting a license for one of defendant SEO's clients.  During that conversation, defendant SEO told defendant SALAO "please reinstate this license ASAP and let me know."  Defendant SALAO responded three minutes later: "It's reinstated."  After defendant SEO thanked him, defendant SALAO wrote: "APC customer service."

**Overt Act No. 49:**  On March 27, 2014, defendant SEO and defendant SALAO, in a text message conversation, discussed delaying the licensing process for certain targeted businesses.  During that conversation, defendant SEO told defendant SALAO: "I will give you list of clients that just played me for free info and will file themselves or with cheap consultant.  I need your help and make sure they hit many road bumps."  Defendant SALAO responded: "Fuck em. I'll make it impossible for them without AP help."

**Overt Act No. 50:**  On March 18, 2016, defendant SEO and defendant SALAO, in a text message conversation, discussed delaying

the licensing process for defendant SEO's competitors.  During that

conversation, defendant SEO told defendant SALAO: "The way to kill

off [two competitors] is on your end.  Scrutinize the shit out of

their cases and delay is the key.  And 309 find a way not to grant [a

fine].  Give maximum penalty and make note of their clients and APC

enforcement for second pop and raise the penalty.  Then I send APC

letter to them.  LOL.  We may not able to stop people from going to

them the first time but we can steal them for the second violation."

Defendant SALAO responded: "Ever moving parts to ktown dominance."

g.   Concealing Material Facts

Overt Act No. 51:  On December 17, 2015, defendant SEO and

defendant SALAO, in a text message conversation, discussed concealing

their scheme to alter official ABC documents.  During that

conversation, defendant SALAO stated: "I'm still so paranoid though.

I was checking ceiling tiles in the base file room to make sure there

weren't cameras."  Defendant SEO responded: "Paranoia is GOOD. that

means you're alert.  Shit happens when you're complacent."  Defendant

SEO then wrote: "When you said you were paranoid about base file area

I had a thought.  It would [b]e funny to see base files shrink to half

and you expand your garage for all APC files.  Lol."  Defendant SALAO

responded: "That would be great.  More APC files the better the

college the boys go to!"  Defendant SEO then wrote: "LOL. Private."

Overt Act No. 52:  On January 15, 2016, defendant SEO and

defendant SALAO, in a text message conversation, discussed Business 4

engaging in human trafficking.  During that conversation, defendant

SALAO warned: "Just make sure your name is nowhere to be found."

Defendant SEO responded: "You got it."  Defendant SALAO then wrote:

"First thing Feds will do is freeze your assets and then there'll be checks made out to me."

> h.   Payments from Koreatown Businesses

Overt Act No. 53: On August 11, 2015, defendant SEO and defendant SALAO, in a text message conversation, discussed their "ops plan." During that conversation, defendant SEO told defendant SALAO that he found a complete list of Koreatown businesses in his Gmail account, and added "I'm slow this month so I will dedicate entire month to APC and membership to these fools. [An unindicted co-conspirator] offered to act as sales agent. Her looks will get her through the door." Defendant SALAO responded: "Now slow down on [the unindicted co-conspirator] going door to door. We should pop them APC style first to lure them in. Then slam them with membership." Co-conspirator SALAO later wrote: "If they don't sign we at least extort them for money. Correction. Extort is such a harsh word. Help them with their lack of compliance sounds better." Defendant SEO responded: "I totally agree. When we meet Monday we need to seriously coordinate this APC."

Overt Act No. 54: On August 11, 2015, defendant SEO sent an e-mail to defendant SALAO, sending an attachment titled "APC ACTION PLAN," which described a "to do list," including defendant SEO setting up a website, creating and sending marketing letters, and creating an "ABC violation prone restaurant list," and defendant SALAO providing a "61, CUP, ABC violation list" and a "[n]ew ABC license application list" on a weekly basis.

> i.   *Business 5*

Overt Act No. 55: On October 6, 2014, defendant SEO and defendant SALAO, in a text message conversation, discussed a recent

ABC violation at Business 5.  During that conversation, defendant SALAO informed defendant SEO that Business 5 had "b-girl" violations from a recent ABC visit.  Defendant SALAO told defendant SEO to advise the business "to cool it for the next couple of weeks," but defendant SEO responded: "No let's get them busted.  Fuck it.  Then we can do damage control."

Overt Act No. 56:  On November 19, 2014, defendant SEO and defendant SALAO, in a text message conversation, discussed their plan regarding Business 5.  During that conversation, defendant SEO told defendant SALAO: "I thought about it and I have a plan... Here's what I plan.  Tell me if feasible... Call us in for original 35 days to scare him.  Then we come back in and then make it seem I reduced it to [a fine].  That will have better effect on AP."  Defendant SALAO responded: "Yeah not a problem.  We can do the first 309 anytime."

Overt Act No. 57:  On December 19, 2014, defendant SEO and defendant SALAO, in a text message conversation, discussed the fee defendant SEO charged for his services.  During that conversation, defendant SEO told defendant SALAO that he "[g]ot 3k last night" from the owner of Business 5.  Defendant SALAO responded: "Damn! 3K [$3,000] just like that?  We are gonna rape Ktown!"  Later that day, defendant SEO told defendant SALAO: "When we meet I will have some plans ready like korean news media and how we can use them to pump fear into Ktown."  Defendant SALAO responded: "I'm open to whatever lines our wallets!"

### ii.  Business 6

Overt Act No. 58:  On January 23, 2015, defendant SEO sent a text message to defendant SALAO with a list of businesses for ABC to raid in Koreatown, including Business 6.

Overt Act No. 59:   On January 24, 2015, defendant SALAO caused the ABC to raid Business 6.

Overt Act No. 60:   On February 27, 2015, defendant SEO accompanied the licensee of Business 6 to a 309 hearing at the ABC office.

Overt Act No. 61:   On March 6, 2015, defendant SEO deposited a $2,950 check from Business 6 into the ABC LLC Account.

### iii. Business 7

Overt Act No. 62:   On July 30, 2015, defendant SEO sent an e-mail to defendant SALAO, with a list of businesses for ABC to raid, including Business 7, writing: "Anything is good.  Ex client... Good scare will do.  Maybe take photo of b girls."

Overt Act No. 63:   On August 1, 2015, defendant SALAO caused the ABC to raid Business 7.

Overt Act No. 64:   On August 5, 2015, defendant SALAO, in his official ABC capacity and using ABC letterhead, sent a letter by U.S. Mail to Business 7, requesting a 309 meeting.

Overt Act No. 65:   On August 20, 2015, defendant SEO met with the owner of Business 7 to discuss the ABC violation.

Overt Act No. 66:   On August 26, 2015, defendant SEO deposited a $2,000 check from Business 7 into the ABC LLC Account.

### iv. Business 8

Overt Act No. 67:   On August 13, 2015, defendant SEO, in a text message conversation, told defendant SALAO to direct an ABC raid against Business 8.

Overt Act No. 68:   On August 14, 2015, defendant SALAO caused the ABC to raid Business 8.

1       Overt Act No. 69:  On September 2, 2015, defendant SALAO, in his

2   official ABC capacity and using ABC letterhead, sent a letter by U.S.

3   Mail to Business 8, requesting a 309 meeting.

4       Overt Act No. 70:  On September 16, 2015, defendant SEO

5   accompanied the licensee of Business 8 to a 309 hearing at the ABC

6   office.

7       Overt Act No. 71:  On September 17, 2015, defendant SEO, in a

8   text message conversation, confirmed to defendant SALAO that

9   defendant SEO would charge Business 8 $2,500 for the 309 hearing.

COUNTS TWO THROUGH NINE

[18 U.S.C. §§ 1341, 1343, 1346; 18 U.S.C. §§ 2(a), (b)]

22. The Grand Jury hereby repeats, re-alleges, and incorporates by reference paragraph 21 of Count One of this Indictment as if set forth fully herein.

A. THE SCHEME TO DEFRAUD

23. Beginning on an unknown date but no later than December 9, 2011, and continuing until on or about May 3, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant SEO and defendant SALAO, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud the citizens of the State of California and defendant SALAO's employer, the ABC, of their right to the honest services of their public officials through bribery and kickbacks, materially false and fraudulent pretenses and representations, and the concealment of material information.

B. MEANS AND METHODS OF THE SCHEME TO DEFRAUD

24. The scheme to defraud operated, in substance, in the manner and by the means described in Paragraph 20 of Count One of this Indictment.

C. USE OF THE MAIL

25. On or about the dates set forth below, within the Central District of California and elsewhere, defendant SEO and defendant SALAO, each aiding and abetting the other, for the purpose of executing the above-described scheme to defraud, willfully caused the following items to be placed in an authorized depository for mail

matter to be sent and delivered by the United States Postal Service according to the directions thereon:

| COUNT | DATE | MAILING |
|-------|------|---------|
| TWO | 04/07/2015 | Letter from defendant SALAO in his official ABC capacity to Business 2, issuing a warning. |
| THREE | 08/24/2015 | Envelope from Alcoholic Beverage Control, LLC addressed to Business 3, containing marketing material. |
| FOUR | 02/08/2016 | Letter from defendant SALAO in his official ABC capacity to Business 3, requesting a 309 meeting. |
| FIVE | 02/08/2016 | Letter from defendant SALAO in his official ABC capacity to Business 4, requesting a 309 meeting. |

D.   USE OF WIRES

     26.   On or about the dates set forth below, within the Central District of California and elsewhere, defendant SEO and defendant SALAO, each aiding and abetting the other, for the purpose of executing the above-described scheme to defraud, transmitted and caused the transmission of the following items by means of wire communication in interstate commerce:

| COUNT | DATE | WIRE TRANSMISSION |
|-------|------|-------------------|
| SIX | 12/18/2014 | E-mail from defendant SEO's Gmail account to defendant SALAO's Yahoo account, sending an attachment containing a target list titled "Koreatown Karaoke List," including Business 2. |
| SEVEN | 07/30/2015 | E-mail from defendant SEO's Gmail account to defendant SALAO's Yahoo account, sending an attachment containing a target list, including Business 7. |
| EIGHT | 08/11/2015 | E-mail from defendant SEO's Gmail account to defendant SALAO's Yahoo account, sending an attachment titled "APC ACTION PLAN." |
| NINE | 10/22/2015 | E-mail from defendant SEO's Gmail account to defendant SALAO's Yahoo account, sending an attachment containing a target list, including Business 5. |

COUNTS TEN THROUGH THIRTEEN

[18 U.S.C. § 666(a)(2)]

27.  The Grand Jury hereby repeats, re-alleges, and incorporates by reference paragraphs 20 and 21 of Count One of this Indictment as if set forth fully herein.

28.  On or about the following dates, in Los Angeles County, within the Central District of California, defendant SEO corruptly gave, offered, and agreed to give things of value to co-conspirator Salao, that is, the monetary payments set forth below, intending to influence and reward co-conspirator Salao in connection with business, transactions, and series of transactions of the ABC, having a value of $5,000 or more, namely: (a) directing ABC enforcement operations and disciplinary actions against targeted businesses SEO selected; (b) altering official ABC documents for defendant SEO's clients, including modifying diagrams and conditions in 257 Forms; (c) sharing non-public information with defendant SEO to benefit defendant SEO and his clients; (d) expediting the licensing process for defendant SEO's clients; and (e) delaying the licensing process for defendant SEO's competitors.

//
//
//
//
//
//
//
//
//

| COUNT | DATE(S) | THING OF VALUE |
|---|---|---|
| TEN | Between 04/24/2014 and 03/04/2015 | $7,000 in three checks |
| ELEVEN | Between 04/30/2015 and 08/20/2015 | $7,250 in two checks and cash |
| TWELVE | 10/14/2015 | $5,250 check |
| THIRTEEN | 05/24/2016 | $5,000 cash |

A TRUE BILL

/ S /

_____
Foreperson

NICOLA T. HANNA
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

MACK E. JENKINS
Assistant United States Attorney
Chief, Public Corruption and
   Civil Rights Section

DANIEL J. O'BRIEN
Assistant United States Attorney
Deputy Chief, Public Corruption and
   Civil Rights Section

VERONICA DRAGALIN
Assistant United States Attorney
Public Corruption and Civil Rights
   Section